**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| LINDA S. COOK, | ) | CASE NO. 3:13-CV-1114 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| CAROLYN W. COLVIN, | ) | VECCHIARELLI |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Linda S. Cook ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423.  This case is

before the undersigned United States Magistrate Judge pursuant to an automatic

referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

On January 8, 2010, Plaintiff filed an application for POD and DIB, alleging a

disability onset date of December 1, 2008.  (Administrative Transcript ("Tr.") 13.)  The

application was denied initially and upon reconsideration, and Plaintiff requested a

hearing before an administrative law judge ("ALJ").  (*Id.*)  On May 9, 2011, an ALJ

conducted a hearing, at which Plaintiff, who was represented by a non-attorney

representative, testified. (*Id.*) An impartial vocational expert ("VE") also testified. (*Id.*) On August 26, 2011, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. 13-22.) On January 16, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On May 16, 2013, Plaintiff, through counsel, filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this matter. (Doc. Nos. 28, 29, 31.)

Plaintiff asserts that substantial evidence does not support the ALJ's decision because: (1) the ALJ improperly analyzed the issue of whether Plaintiff has fibromyalgia: (2) the ALJ failed to limit Plaintiff's exposure to specific "odors" in the determination of Plaintiff's residual functional capacity("RFC"); and (3) Plaintiff's subsequent application for benefits was granted.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in March 1951 and was 57 years old on the date of her administrative hearing. (Tr. 131.) She reported past work as an attorney and paralegal. (Tr. 164.)

### B. Medical Evidence

#### 1. Plaintiff's Providers

On March 18, 2008, Plaintiff presented to the emergency department at Flower Hospital, complaining of malaise, fever, diffuse myalgias and headache. (tr. 495.) A scan of Plaintiff's chest revealed multifocal airspace disease in the lower lungs. (Tr.

2

297.)  Emergency room physicians diagnosed Plaintiff with pneumonia with asthmatic bronchitis, and prescribed antibiotics and IV fluids.  (Tr. 495-96.)  Plaintiff was discharged on March 23, 2008.  (Tr. 480.)

An October 2008 image of Plaintiff's thoracic spine revealed minor degenerative disk disease at C5-6 and C6-7.  (Tr. 298.)

In January 2009, pulmonologist  Hany J. Jacob, M.D.,[1] diagnosed Plaintiff with variable obstructive lung disease and asthma with multiple exacerbations.  (Tr. 287.)  On February 4, 2009, he examined Plaintiff, noting her history of recurrent pneumonia and excessive daytime sleepiness.  (Tr. 285-86.)  Dr. Jacob noted that a CT scan of Plaintiff's sinuses was positive for sinusitis.  (Tr. 285.)  He diagnosed Plaintiff with adult onset asthma secondary to severe sinusitis and postnasal drip syndrome.  (*Id.*)  He instructed Plaintiff to maintain a sinus irrigation program.  (*Id.*)

On February 20, 2009, Plaintiff reported to the emergency department at Flower Hospital, complaining of a persistent cough, wheezing and back pain.  (Tr. 456-57.)  Emergency personnel diagnosed her with bronchitis.  (Tr. 452.)

In February and March 2009, Plaintiff underwent a sleep study after complaining of excessive day time sleepiness.  (Tr. 308-14.)  The physician conducting the study noted that Plaintiff was morbidly obese with a neck circumference of 37 centimeters.  (Tr. 308.)  The physician diagnosed Plaintiff with moderately severe obstructive sleep apnea, noting that she had responded well to a CPAP machine.  (Tr. 309.)  He recommended that Plaintiff use a CPAP machine, avoid sleeping in the supine position,

---

[1]Dr. Jacob also appears in the record as "Dr. Khalil-Jacob."

3

and lose weight.  (Tr. 310.)

On March 9, 2009, Dr. Jacob noted Plaintiff's report that her daytime sleepiness had improved with the CPAP machine.  (Tr. 283.)  He also noted that she was taking albuterol treatments three times daily, and taking Symbicort. (*Id.*) He instructed Plaintiff to undergo a bronchoscopy and continue with sinus irrigation.  (Tr. 284.)  A March 25, 2009 fiberoptic bronchoscopy yielded normal results.  (Tr. 291.)  On April 3, 2009, Dr. Jacob noted that the bronchoscopy was "essentially unremarkable," and instructed Plaintiff to continue to use the CPAP and sinus irrigation.  (Tr. 282.)  On August 4, 2009, Dr. Jacob ascertained that Plaintiff had been using the Symbicort incorrectly, that is, she was taking it as needed instead of three times each day.  (Tr. 280.)  He instructed her in the proper use of the medication, and noted that a pulmonary function test showed a mils degree of obstructive lung disease.  (*Id.*)  He opined that she was "doing well overall," and that her asthma and obstructive sleep apnea were responding well to treatment.  (Tr. 281.)

A September 24, 2009 image of Plaintiff's lumbar spine revealed minimal degenerative disc disease at L3-4.  (Tr. 439.)  An October 16, 2009 MRI of Plaintiff's lumbosacral spine revealed bulging at L3-4 and L4-5.  (Tr. 437.)

On November 12, 2009, pain management physician Vivek Trivedi, M.D., examined Plaintiff, who complained of right low back pain that radiated into her right leg, as well as numbness in her right leg.  (Tr. 336.)  He opined that she had lumbar radiculopathy, lumbar degenerative disc disease, and sacroilitis and recommended that Plaintiff undergo steroid injections.  (Tr. 336-37.)  On December 23, 2009, Plaintiff received steroid injections.  (Tr. 347-48.)

4

On January 27, 2010, pulmonary and critical care physician Anthony Courey, M.D., examined Plaintiff, who reported a history of longstanding, recurrent chest and abdominal pain, as well as recurrent pneumonia and sinus infections.  (Tr. 402.) Because Plaintiff was not exhibiting any acute symptoms at that time, Dr. Courey recommended that she undergo: basic lab screening; an echocardiogram; and, when she was symptomatic, a chest CT and bronchoscopy.  (*Id.*)

On January 28, 2010, Dr. Trivedi examined Plaintiff, who complained of continued lower back pain that radiated into her leg, but noted some relief from the injections.  (Tr. 330.)  He recommended back exercises, pain medication, a TENS unit, and more epidural injections.  (*Id.*)

On March 10, 2010, Plaintiff followed up with Dr. Courey.  (Tr. 398-99.)  She reported "hypersensitivity to numerous irritants including perfumes, etc.," as well as episodic pain in her chest, back, shoulder and girdle.  (Tr. 398.)  Dr. Courey "suspect[ed]" that Plaintiff had fibromyalgia, and recommended that she see a rheumatologist.  (*Id.*)  He also recommended nasal spray and a regular aerobic exercise program.  (*Id.*)

A March 22, 2010 MRI of Plaintiff's shoulder revealed a significant tear along the bursal surface of the supraspinatus tendon, and acromioclavicular joint osteoarthropathy.  (Tr. 428.)  On April 12, 2010, Dr. Jacob examined Plaintiff for "surgery clearance."  (Tr. 681.)  He noted that Plaintiff had "mild persistent asthma for which Symbicort and Albuterol has been given.  She has been stable overall."  (*Id.*)  He cleared her for rotator cuff surgery.  (*Id.*)  On April 26, 2010, Plaintiff underwent rotator cuff repair surgery.  (Tr. 631-32.)

5

On May 4, 2010, rheumatologist Michael A. Gordon, M.D., examined Plaintiff, who reported Dr. Courey's suspicion that she had fibromyalgia.  (Tr. 566-70.)  Dr. Gordon noted that Plaintiff had "no significant tenderness in any of the 18 A[merican] C[ollege] of R[heumatology] defined tender points."  (Tr. 569.)  He noted Plaintiff's history of respiratory problems, and observed that "[f]ibromyalgia generally does not cause respiratory problems."  (Tr. 569-70.)  He opined that Plaintiff had "little clinically to suggest fibromyalgia," as she "denies generalized musculoskeletal pain and aching and she does not have tender points on her physical exam."  (Tr. 569-70.)  Dr. Gordon diagnosed Plaintiff with lumbar and cervical degenerative disc disease and a rotator cuff tear.  (Tr. 569.)

On June 14, 2010, podiatrist John W. Lane, D.P.M., completed a medical source statement, in which he indicated that he had treated Plaintiff since February 1998 for osteoarthritis, fasciitis, and pain.  (Tr. 553-54.)  He opined that she could "walk and stand," but "needs rest w[ith] prolonged walking or standing."  (Tr. 555.)  Records that accompanied Dr. Lane's statement reflect that he had treated Plaintiff for a stress fracture of her right foot, fasciitis, osteoarthritis, and heel spur.  (Tr. 556-62.)

On June 18, 2010, family physician Glenn Dregansky, D.O., completed a medical source statement.  (Tr. 637-39.)  He indicated that he had last treated Plaintiff on that date, and that she had asthma, obstructive sleep apnea, and chronic obstructive pulmonary disease ("COPD").  (Tr. 638.)  He described Plaintiff's symptoms as "[r]ecurrent wheezing and shortness of breath, [and] abnormal p[ulmonary] f[unction] t[ests]."  (*Id.*)  He indicated that she was compliant with all medications, with "generally good compliance and response to therapy," and that Plaintiff "frequently cannot work

6

due to exacerbations of her asthma which is not well controlled." (Tr. 639.)

On August 20, 2010, Dr. Dregansky noted Plaintiff's complaint that "fumes from the asphalt" from road work in front of her house were causing chest pains, shortness of breath and coughing. (Tr. 666.) Dr. Dregansky diagnosed her with exacerbation of asthma with some pleurisy, and prescribed prednisone. (*Id.*) On August 23, 2010, Dr. Jacob opined that Plaintiff had chronic sinusitis with acute exacerbation, and mild to moderate persistent asthma. (Tr. 673.) He instructed her to obtain a CT scan of her sinuses. (*Id.*) On September 30, 2010, Dr. Jacob noted that a CT scan revealed bilateral thickening of the mucosal meatuses, and recommended that Plaintiff obtain a consultation with an ear, nose and throat ("ENT") specialist. (Tr. 674.)

On October 26, 2010, Plaintiff complained to Dr. Dregansky of shortness of breath and wheezing. (Tr. 668.) He diagnosed her with persistent exacerbation of asthma and COPD. (*Id.*) On November 4, 2010, Plaintiff made similar complaints, and Dr. Dregansky diagnosed her with asthmatic bronchitis. (Tr. 669.) He noted that antibiotics and steroids had not improved her condition, and recommended that she obtain the opinion of a pulmonologist and a CT scan of her chest. (*Id.*)

On November 18, 2010, ENT physician William A. Johnson IV, M.D., examined Plaintiff and diagnosed her with perennial non-allergic rhinitis. (Tr. 665.) He recommended that she use an intranasal steroid spray. (*Id.*)

### 2.    Agency Reports

On March 23, 2010, agency consulting physician Elizabeth Das, M.D., performed a physical RFC assessment. (Tr. 542-49.) She assigned Plaintiff no exertional, postural, manipulative, visual or communicative limitations. (Tr. 543-46.) Dr. Das

7

opined that Plaintiff should avoid concentrated exposure to: extreme heat and cold; wetness; and fumes, odors, dusts, gases, and poor ventilation.  (Tr. 546.)

On July 20, 2010, agency consulting physician Maureen Gallagher performed a physical RFC assessment.  (Tr. 642-49.)  She opined that Plaintiff could: lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for two hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally climb ramps and stairs, stoop and crouch; never climb ladders, ropes and scaffolds; and frequently reach overhead with her right arm.  (Tr. 643-45.)  Dr. Gallagher opined that Plaintiff should avoid all concentrated exposure to extreme heat and cold, and should avoid all exposure to fumes, odors, dusts, gases and poor ventilation.  (Tr. 646.)

### 3.      Third Party Statements

In November 2010, Plaintiff's former employer, Dorothy M. Kennedy, authored a letter describing the circumstances of Plaintiff's termination from her employment as a paralegal, and the extreme conditions required to allow Plaintiff to attend work.  (Tr. 266-68.)  Ms. Kennedy indicated that, in order to accommodate Plaintiff's lung issues, Ms. Kennedy "had to bar our staff from wearing perfume, using scented lotions, hair spray, deodorant or scented soap."  (Tr. 266.)  Ms. Kennedy stated that the cleaning staff had to arrange its schedule to allow time for the fumes from chemicals to dissipate before Plaintiff arrived at work.  (*Id.*)  She had to coordinate with other tenants in the building so that Plaintiff could work offsite when they were painting offices.  (*Id.*)  If Plaintiff was exposed to a client's perfume, scented soap, deodorant or hair spray, she became ill within 20 minutes of the exposure.  (Tr. 267.)  According to Ms. Kennedy, when this occurred, Plaintiff would cough until she gagged or vomited.  (*Id.*)  Eventually,

8

Ms. Kennedy laid Plaintiff off because she could no longer accommodate either Plaintiff's needs or her excessive absences.  (Tr. 266.)  Ms. Kennedy opined that no one would be wiling to employ Plaintiff, given the conditions that she required in order to work, and given the rate of her absenteeism, which Ms. Kennedy described as missing 10-20 days per month.  (Tr. 267-68.)  She stated that she believed that Plaintiff was "totally disabled."

**C.     Hearing Testimony**

**1.      Plaintiff's Hearing Testimony**

At her May 9, 2011 administrative hearing, Plaintiff testified as follows:

She had worked as an attorney and a paralegal.  (Tr. 39-40.)  She stopped working in December 2008 because she "kept getting pneumonia, pleurisy, and bronchitis and I was too sick to keep going in."  (Tr. 41.)  Her employer had laid her off because she could not come into the office enough.  (*Id.*)  At that point, Plaintiff was working a half day, two days each week.  (Tr. 42.)

Plaintiff had been told by various physicians that she was allergic to "all kinds of things," or to "everything just in small amounts that it didn't show up."  (Tr. 44.)  Plaintiff described an extreme allergic reaction to chemicals:

> But I don't wear hair spray, I can't wear makeup, I can't – if I'm – even now my chest is killing me.  I had to use the emergency inhaler just from being near that security guard with the perfume.  And I can almost guarantee you within two days I'll be back to the doctor because I'll have pneumonia.
>
> *   *   *
>
> [N]o one is going to hire me and keep me when I'm sick kind of 20 or more days in the month and I can't go in.  And you

9

> know, any kind of perfume, hair sprays, cleaning solutions,
> any of those things trigger it all.  So you know, if I were to
> work here and someone wanted to come in and clean while
> I'm here, they have to clean then [be] all gone by the time I
> come in.  You know at [her former employer], no one was
> allowed to wear perfume.  They couldn't wear hand lotion.
> They couldn't spray the stuff in the bathroom because it all
> triggers the asthma and it triggers the lungs into going into
> pneumonia, the bronchitis and the pleurisy.  You know, I
> could – quite honestly I was feeling pretty good other than
> my leg when I came in here and I'm not feeling so hot just
> from that brief contact [with the security guard] downstairs, it
> does that.

(Tr. 44-46.)

Plaintiff was constantly tired because she coughed all night and could not sleep.

(Tr. 47-48.)  She described her illness as starting with pain that radiated through her

chest and back, and into her ears and throat.  (Tr. 52.)  She developed difficulty

breathing and her limbs grew weak.  (*Id.*)  She developed mucus and coughed so hard

trying to expel it that she eventually gagged and vomited.  (Tr. 52-53.)  This occurred

once or twice each month.  (Tr. 49-50.)

Plaintiff had difficulty carrying a gallon of milk to her home from the grocery store

that was two houses away from where she lived.  (Tr. 53.)  She developed numbness

and pain in her leg, foot, buttocks and lower back when sitting.  (*Id.*)  She took breathing

treatments four times each day that took 20 to 25 minutes.  (Tr. 58-59.)  When she was

employed, she fit her breathing treatments into her work schedule by taking a longer

lunch and leaving early.  (Tr. 59.)  Plaintiff did not, however, believe that the breathing

treatments helped her condition.  (Tr. 59-60.)  She went to the grocery store about twice

each week and visited her son at his house next door to her own house about two or

three times each week.  (Tr. 63-64.)  Plaintiff went out to eat with her husband about

10

two times each month, but generally grew ill because of the people around her when she was out in public.  (Tr. 64.)

### 2.  Vocational Expert's Hearing Testimony

The ALJ described the following hypothetical individual of Plaintiff's age, education and work history:

> [L]imited to less than a full range of light work, defined as lifting up to 20 pounds occasionally, lift/carry up to 10 pounds frequently; standing and walking for about four hours and sitting for up to six hours in an eight hour work day with normal breaks, in addition, no climbing of ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasional balancing; occasional stooping; occasional kneeling; occasional crouching and occasional crawling.  In addition, avoid all exposure to extreme cold, avoiding all exposure to extreme heat and avoiding all exposure to environmental irritants such as fumes, odors, dust, and gases and avoiding all exposure to poorly ventilated areas.

(Tr. 68.)  The VE opined that the hypothetical individual could perform Plaintiff's past work as a paralegal and attorney.  (*Id.*)

## III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and*

11

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Act through December 31, 2013.

2.    Plaintiff has not engaged in substantial gainful activity since December 1, 2008, the alleged onset date.

3.    Plaintiff has the severe impairments of degenerative disc disease; right rotator cuff rupture, status post repair; asthma/chronic obstructive pulmonary disease; obstructive sleep apnea (controlled with a CPAP machine); mild foot osteoarthritis; and obesity.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) in that she can lift up to 20 pounds occasionally and lift/carry up to 10 pounds frequently.  She can stand/walk for about four hours and sit for up to six hours in an eight-hour workday, with normal breaks.  Plaintiff can never climb ladders, ropes or scaffolds.  She is limited to occasional climbing of ramps or stairs; and occasional balancing, stooping, crouching and crawling.  She must avoid all exposure to extreme cold and heat.  Plaintiff must avoid all exposure to environmental irritants, such as fumes, odors, dusts and gases, and she must avoid all exposure to poorly ventilated areas.

6.    Plaintiff is capable of performing her past relevant work as a paralegal and attorney.  This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

7.    Plaintiff has not been under a disability, as defined in the Act, from December 1, 2008 through August 26, 2011, the date of the ALJ's decision.

(Tr. 15-21.)


**LAW & ANALYSIS**

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in

13

the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

Plaintiff asserts that substantial evidence does not support the ALJ's decision because: (1) the ALJ improperly analyzed the issue of whether Plaintiff has fibromyalgia: (2) the ALJ failed to limit Plaintiff's exposure to specific "odors" in the determination of Plaintiff's residual functional capacity("RFC"); and (3) Plaintiff's subsequent application for benefits was granted.[2]

---

[2] Review of Plaintiff's brief reveals that the font size employed by Plaintiff's Counsel is smaller than the 12 point font that is standard in this Court. Further, the Background section of Plaintiff's brief contains information that is not relevant to Plaintiff's arguments, and appears to be the transcription of dictation or notes made during Counsel's review of the medical records in this case. The notes are often not only phrases and incomplete sentences, but also presented without any theme or

### 1.  Fibromyalgia

Plaintiff contends that the ALJ erred in analyzing the issue of fibromyalgia because the ALJ cited a lack of objective medical findings to support her conclusion that Plaintiff did not have the condition.  Plaintiff's argument on this point relies on two sources.  The first is Social Security Ruling 12-2P; Titles II and XVI: Evaluation of Fibromyalgia (S.S.A. July 25, 2012) ("SSR 12-2p").  In that ruling, the Commissioner set forth, *inter alias*, the standard for evaluating claims of disability based on fibromyalgia, including the relevant criteria for establishing that a claimant has the medically determinable impairment ("MDI") of fibromyalgia.  Under Section II of SSR 12-2p, a claimant can establish that she has fibromyalgia by satisfying one of two sets of criteria:

> A. The 1990 ACR Criteria for the Classification of Fibromyalgia.  Based on these criteria, we may find that a person has an MDI of [fibromyalgia] if he or she has all three of the following:
>
> 1. A history of widespread pain – that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) – that has persisted (or that persisted) for at least 3 months.  The pain may fluctuate in intensity and may not always be present.
>
> 2. At least 11 positive tender points on physical examination[.]  The tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.
>
> *   *   *

---

meaningful organization.  The resulting lack of clarity places tremendous burden on the Court to review the briefing.  This Court's review of briefs filed by Plaintiff's Counsel in other cases reveals the same issues.  Counsel is directed that, in the future, the filing of a brief with these deficiencies may result in the brief being stricken and rejected, and/or the issuance of a show cause order.

15

    3. Evidence that other disorders that could cause the symptoms or signs were excluded.  Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from [fibromyalgia]. Therefore, it is common in cases involving [fibromyalgia] to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs.  Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor).

    [or]

    B. The 2010 ACR Preliminary Diagnostic Criteria.  Based on these criteria, we may find that a person has an MDI of [fibromyalgia] if he or she has all three of the following criteria:

    1. A history of widespread pain (see section II.A.1.);

    2. Repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

    3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded (see section II.A.3.).

SSR 12-2p at *3.

       The second source upon which Plaintiff relies is case law from this Circuit noting that fibromyalgia typically does not result in objective medical findings, and, thus, that the "traditional" assessment of treating physician opinions may not apply.  *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245 (6th Cir. 2007) ("[I]n light of the unique evidentiary difficulties associatde with the diagnosis and treatment of fibromyalgia, [medical] opinions that focus solely upon objective evidence are not

particularly relevant."); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (Baughman, M.J.) ("[F]ibromyalgia defies diagnosis by objective clinical, diagnostic or laboratory findings.  As fibromyalgia has become better understood, courts have come to recognize that the traditional formula . . . is ill suited to testing treating physicians [*sic*] opinions about the limitations caused by that disease.").

In her decision, the ALJ determined that, "[t]here is . . .  no objective evidence that [Plaintiff] has fibromyalgia."  (Tr. 20.)  Plaintiff argues that the ALJ erred in failing to conduct any further analysis of the issue of whether Plaintiff had fibromyalgia.  This argument lacks merit.  Unlike the cases upon which Plaintiff relies, this is not a case in which the ALJ rejected or gave limited weight to the opinion of a treating physician who had opined that Plaintiff has fibromyalgia.  Review of the record in this case reveals that Dr. Gordon, a rheumatologist, examined Plaintiff and opined that she had few clinical symptoms of fibromyalgia.  (Tr. 669-70.)  Although a single physician – Dr. Courey, a pulmonologist –  opined that Plaintiff *may* have fibromyalgia, no medical source actually diagnosed the condition.  Accordingly, the ALJ's description of the record evidence regarding fibromyalgia is correct.  There simply was no objective evidence that Plaintiff satisfied the criteria set forth in SSR 12-2p.  Further, Plaintiff points to no other evidence in the record – either objective or subjective – that relates either to a diagnosis of fibromyalgia or to the criteria set forth in SSR 12-2p.  In other words, Plaintiff argues that the ALJ should have engaged in further analysis, but fails to identify precisely what the ALJ should have analyzed, or how that evidence supports a finding that Plaintiff had fibromyalgia.

Further, review of the ALJ's decision reflects that she did consider Plaintiff's

17

subjective complaints of pain and limitation resulting from fibromyalgia, but found them not credible. (Tr. 19-20.) She noted that Plaintiff's "testimony lacks diagnostic support and other objective evidence consistent with the alleged severity," and was "not well supported by the objective evidence in the record." (Tr. 19, 20.) Plaintiff does not challenge this credibility finding, which is entitled to considerable deference. *See Siterlet v. Sec'y of Health & Human Servs., 823 F.2d 918, 920 (6th Cir. 1987); Villarreal v. Sec'y of Health & Human Servs., 818 F.2d 461, 463 (6th Cir. 1987).*

Moreover, even if the ALJ erred in failing to further analyze the issue of fibromyalgia, any such error would not require remand in this case. Plaintiff points to no evidence in the record that suggests that the condition affected her ability to work. She offers no argument regarding limitations that would have arisen out of a diagnosis of fibromyalgia, despite bearing the burden of establishing her impairments and their severity. *See Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999)* ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is proving the extent of his impairments*.") (emphasis added). Mere diagnosis of a condition "says nothing about the severity of the condition." *Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988).* Accordingly, this argument presents no basis for remand in this case.[3]

---

[3] In her Reply Brief, Plaintiff argues for the first time that the ALJ erred in failing to consider evidence that Plaintiff underwent pain management treatment, complained of back and leg pain, and suffered from migraines and other stress-induced conditions. She also points out, for the first time, that, in the record of his examination, Dr. Gordon

## 2.  Environmental Restrictions

In her determination of Plaintiff's RFC, the ALJ included the restriction that Plaintiff "must avoid all exposure to environmental irritants, such as fumes, odors, dusts, and gases and she must avoid all exposure to poorly ventilated areas."  (Tr. 17.) Plaintiff argues that the ALJ erred in failing to include additional environmental restrictions in Plaintiff's RFC.  Specifically, Plaintiff argues, "Now, 'odors' is rather nebulous; does it include perfumes, deodorants, hairspray [*sic*], etc?"  (Plaintiff's Brief ("Pl. Br.") 20.)  According to Plaintiff, given the evidence in the record that Plaintiff demonstrated extreme sensitivity to various chemicals, the ALJ should have specified an environmental limitation "beyond merely broad strokes of 'odors,' 'fumes,' [and] gases.'"  (*Id.*)

This argument lacks merit.  Evidence in the record reflected that Plaintiff experiences extreme reactions to chemicals, particularly those with strong odors.  The ALJ incorporated a broad restriction – requiring Plaintiff to avoid all exposure to environmental irritants – into Plaintiff's RFC.  Plaintiff contends that the ALJ should have listed specific irritants in the RFC.  She does not, however, explain how the "broad strokes" of the ALJ's RFC determination fail to account for the specific irritants with which Plaintiff is concerned.  Further, the only evidence in the record establishing

---

noted that he had not reviewed the records from Plaintiff's examination by Dr. Courey and, thus, could not ascertain what Dr. Courey's thoughts were in suggesting that Plaintiff had fibromyalgia.  (Tr. 569-70.)  These arguments are waived, as it is well established that a party should not raise new arguments in a reply brief.  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).  Further, even if this Court considers these arguments, they do not reflect that any physician diagnosed Plaintiff with fibromyalgia.  Nor does the evidence upon which these arguments rely demonstrate any limitations that may have resulted from fibromyalgia.

19

Plaintiff's sensitivity to environmental irritants was her own testimony and the statement of her former employer.  The ALJ determined that Plaintiff was not credible, and she has not challenged that credibility finding.  The ALJ considered the statement of Plaintiff's former employer, but determined that the severity of the symptoms described therein was "not supported by the treatment records, objective evidence and the record as a whole."  (Tr. 20.)  Although Plaintiff points to evidence reflecting her frequent medical treatment for breathing and upper respiratory issues, she points to no medical evidence supporting her allegation that she suffers from an extraordinarily extreme sensitivity to chemicals.  Accordingly, substantial evidence supports the ALJ's determination of Plaintiff's RFC, and this argument provides no basis for remand in this case.

### 3.  Subsequent Agency Decision

Finally, Plaintiff notes that, subsequent to the ALJ decision at issue in this case, she was granted disability benefits.  She has attached a notice regarding that award of benefits to her brief in this matter.  According to Plaintiff, this subsequent award of benefits demonstrates that substantial evidence does not support the ALJ's decision to deny her application for benefits.

This argument lacks merit.  Plaintiff concedes that it is "hard to tell what was used" by the agency in granting Plaintiff's subsequent application for benefits.  (Pl. Br. 23.)  Thus, there is no way to determine whether the different outcome on the subsequent application was based on the evidence in this case, or whether there were additional records and medical opinions that supported Plaintiff's subsequent application.  Accordingly, any argument that the subsequent decision demonstrates that there was insufficient evidence to support the ALJ decision in this case is merely

speculative, and does not merit remand.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: November 18, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**